256 F.3d 516 (7th Cir. 2001)
 Equal Employment Opportunity Commission, Plaintiff-Appellee,
v.
Indiana Bell Telephone Company, Incorporated, doing business as Ameritech Indiana, and Ameritech Corporation, Defendants-Appellants.
 No. 99-1155
 In the United States Court of Appeals For the Seventh Circuit
 Argued November 29, 2000
Decided June 27, 2001
 
 Appeal from the United States District Court for the Southern District of Indiana, Indianapolis Division. No. IP 95-217-C-M/S--Larry J. McKinney, Chief Judge.[Copyrighted Material Omitted][Copyrighted Material Omitted]
 Before Flaum, Chief Judge, and Posner, Easterbrook, Manion, Kanne, Rovner, Diane P. Wood, Evans, and Williams, Circuit Judges.*
 Easterbrook, Circuit Judge.**
 
 
 1
 We reheard this case en banc to address two questions on which we solicited supplemental briefs from the parties:
 
 
 2
 whether, as a matter of law, evidence regarding arbitration and a company's collective bargaining agreement is inadmissible in a Title VII suit to show: 1) that an employer's response to sexual harassment was reasonable for the purpose of determining employer liability; and 2) that the employer did not act with the state of mind necessary for the imposition of punitive damages.
 
 
 3
 The court now holds that this evidence is not relevant to liability and therefore is inadmissible under Fed. R. Evid. 402 with respect to that subject, but that the evidence is relevant to the propriety and amount of punitive damages, see Fed. R. Evid. 401, and therefore is admissible on that issue unless its probative value is "substantially outweighed" by other factors. Fed. R. Evid. 403. Because the district judge thought the evidence irrelevant across the board, we remand for an appropriate exercise of discretion under Rule 403--and, if necessary, a new trial limited to punitive damages.
 
 
 4
 * Gary Amos worked for many years in Ameritech's coin center and its small business unit. Most of the other employees in both places were women, and Amos behaved offensively among them. As long ago as 1975 Barbara Huckeba complained to her supervisor that Amos had exposed himself to her on three occasions. Ameritech's response was to fire Huckeba, "explaining" that Huckeba was more likely to find satisfactory employment elsewhere than was Amos. Two other co-workers also complained in 1975 about sexually offensive conduct; unlike Huckeba, they kept their jobs. So did Amos, who was not disciplined. The record establishes other misconduct in 1988, 1989, 1990, 1991, 1992, 1993, and 1994, including Amos's telling female co-workers that he was in love with them, flashing them, sending notes with sexual messages or propositions, grabbing them and rubbing their hair or buttocks (some times with his hands, sometimes with his erect penis), and allowing himself to be seen masturbating at his desk.
 
 
 5
 In 1989 a flashing incident led to a warning but no other discipline. In 1990 six women complained; five of the six informed Ameritech that Amos had pressed his erect penis against them. Amos was suspended for two weeks by a supervisor who neglected to read Amos's personnel file and thus was unaware of his history of similar conduct. Complaints lodged by women in 1991 and 1992 did not lead to discipline. Although supervisors told Amos to desist, the misconduct continued. But on December 18, 1992, Ameritech's equal employment opportunity coordinator recommended that Amos be fired. That recommendation had to be approved by Ameritech's labor relations manager, who was on vacation. By the time the labor relations manager returned and reviewed the file, more than 30 days had elapsed since Amos's most recent documented misconduct--and the collective bargaining agreement between Ameritech and its union required discipline to occur within 30 days. So once again Ameritech did nothing concrete, though it did tell Amos that any further misconduct could result in suspension or discharge. "Further misconduct" was not long in coming; fresh complaints in February 1993 led to another investigation, at the end of which Ameritech did--nothing, yet again. All through 1993 Amos directed a stream of sexually charged comments and notes to his female co-workers, brushed against them deliberately (sometimes with an erection), showed them pictures of partially undressed women, commented on their clothing, and so on. Their complaints within Ameritech's hierarchy were ineffectual. Another public-masturbation incident in March 1994 at last produced Amos's removal.
 
 
 6
 Amos's co-workers did not turn outside the company until April 1993, when Lori Everts filed with the eeoc a charge of discrimination. The eeoc was sufficiently disturbed by Ameritech's pattern of neglect that it has litigated as the champion of Everts and the other women. Conduct more than 300 days before that charge cannot be reached under Title VII of the Civil Rights Act of 1964, though earlier events may be considered to place the more recent ones in context. Another significant date is November 21, 1991, when the Civil Rights Act of 1991 took effect. The 1991 Act authorizes compensatory and punitive damages for sex discrimination. 42 U.S.C. sec.1981a. Because it is not retroactive, see Landgraf v. USI Film Products, 511 U.S. 244 (1994), only Ameritech's conduct (and injuries female workers sustained) after that date can lead to compensatory or punitive damages.
 
 
 7
 Before trial Ameritech informed the district judge that it planned to defend in part on the theory that the collective bargaining agreement tied its hands and thus excused its failure to discharge Amos until 1994. Ameritech wanted to argue not only that the delay at the end of 1992 foreclosed discipline but also that, if it had fired Amos any earlier than March 1994, an arbitrator might well have concluded that Ameritech lacked "just cause" and reinstated Amos. According to Ameritech, one arbitrator recently had done just that with another employee discharged for making women's working lives miserable, and it feared a repetition. The judge, however, issued a pretrial order excluding this proposed theory of defense and its associated evidence.
 
 
 8
 The jury concluded that, by tolerating Amos's misconduct, Ameritech had engaged in sex discrimination, in violation of Title VII. It awarded three of Amos's co-workers a total of $15,000 in compensatory damages and $1,050,000 in punitive damages. The district judge reduced the punitive damages to a total of $635,000, and the eeoc has not challenged this reduction on appeal. A panel of this court unanimously concluded that Ameritech's supine posture despite ample knowledge made it answerable for Amos's misconduct. 214 F.3d 813, 820-22 (7th Cir. 2000). See also Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 759 (1998) (explaining the circumstances under which an employer's feckless responses to intentional misconduct by an employee means that the misconduct is attributed to the firm). The panel also held that Ameritech's decision not to protect its female workers from Amos's abusive treatment adversely affected their conditions of employment on account of sex, because Amos's misconduct was sufficiently severe and frequent, indeed that the evidence supported punitive damages as well. Ibid. See also Clark County School District v. Breeden, 121 S. Ct. 1508, 1509-10 (2001); Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 78, 81-82 (1998); Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993); Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 72 (1986). But a majority of the panel held that the district judge erred in foreclosing Ameritech's proposed defense, 214 F.3d at 822-25, and it remanded for a new trial. We have reheard the case en banc to consider that subject. The remainder of the panel's decision, vacated on the grant of rehearing en banc, is now reinstated and stands as the opinion of the full court on all issues other than those discussed below.
 
 II
 
 9
 Ameritech contends that the 30-day, just-cause, and arbitration provisions of the collective bargaining agreement demonstrate that its actions were reasonable, and thus that Amos's misconduct should not be attributed to the employer. Its argument has two principal strands: first, Amos's reinstatement (if an arbitrator should conclude that he should not have been fired) could be costly to the company in terms of back pay; second, reinstatement could be costly to Amos's co-workers because it would make Amos that much harder to get rid of in the future. The second line of argument also implies an adverse effect for women who worked elsewhere in the company. An arbitrator's award reinstating Amos might impede efforts to remove harassers throughout the firm, and might correspondingly embolden these men for as long as the current (or a similarly worded) collective bargaining agreement lasts. These are serious concerns, and given the posture of the case we must assume that Ameritech could establish them to a jury's satisfaction. Nonetheless, neither of these reasons is sufficient to defeat liability under Title VII. Three principal considerations lead to this conclusion.
 
 
 10
 * Ameritech supposes that both the collective bargaining agreement and the system of arbitration were imposed on it by forces outside its control, and that it therefore cannot be liable for what arbitrators do (or for what Ameritech itself does in anticipation of what arbitrators may do). Not so.
 
 
 11
 A collective bargaining agreement is just an employment contract, with organized rather than individual workers. No collective bargaining agreement is imposed on an employer; it is an agreement, and the firm has consented to every part of the arrangement. Employers cannot by their consent (in or out of a collective bargaining agreement) avoid duties under federal law. This would be clear enough with an individual contract of employment. Suppose Ameritech hired a new manager under a contract prohibiting the manager's discharge for a term of years unless the division became unprofitable. If the manager took to harassing his female subordinates, or giving them fewer promotions or lower raises than otherwise identical men, Ameritech could not escape responsibility by saying that the manager's contract precluded his removal. Likewise a university could not escape liability for the misconduct of a tenured professor, or a football coach with a long-term contract. The just-cause standard in the collective bargaining agreement offered Amos less protection than any of the employees in these hypotheticals. If employers are liable for the acts of employees they have promised by contract not to discharge, likewise they are liable for the acts of employees who enjoy weaker "just cause" contractual protection.
 
 
 12
 Arbitration itself is a contractual arrangement. Ameritech treats arbitration as increasing the amount of misconduct that an employee may commit before becoming eligible for discharge. If, as we have just explained, a contractual prohibition on discharge does not avoid liability under Title VII, then a procedural device pointing in that direction cannot do so.
 
 
 13
 Some arbitrators doubtless are tolerant of employees who engage in sexual harassment--indeed, more tolerant than the law allows. This problem was well known to anyone who read the case reports before 1992, when the specter of arbitration first affected Ameritech's handling of Amos. See, e.g., Newsday, Inc. v. Long Island Typographical Union, 915 F.2d 840 (2d Cir. 1990); Communications Workers v. Southeastern Electric Cooperative, 882 F.2d 467 (10th Cir. 1989). Ameritech could have negotiated for a provision defining sex harassment (or other discrimination) as "just cause," or limiting arbitrators' authority to reinstate persons discharged for events that violate federal law. But it did not do this, and it is in no position to insist that its female employees suffer the consequences of its negotiating strategy. Ameritech must itself bear the consequences of its labor-relations decisions. Cf. W.R. Grace & Co. v. Rubber Workers, 461 U.S. 757, 766-70 (1983). Seniority provisions in collective bargaining provisions receive special treatment under Title VII. 42 U.S.C. sec.sec. 2000e-2(h), 2000e-5(e). This strongly implies that other terms of labor agreements do not exculpate conduct that would violate Title VII if prescribed unilaterally by employers. Nor does it matter that the collective bargaining agreement is bilateral rather than unilateral; a union cannot surrender employees' rights under Title VII. See Wright v. Universal Maritime Service Corp., 525 U.S. 70, 75-76 (1998); Alexander v. Gardner-Denver Co., 415 U.S. 36, 51 (1974); Pryner v. Tractor Supply Co., 109 F.3d 354 (7th Cir. 1997).
 
 
 14
 What is more, Ameritech is wrong to suppose that an arbitrator is some outside force even ex post its agreement to a given arbitration clause. As Eastern Associated Coal Corp. v. United Mine Workers, 121 S. Ct. 462 (2000), observes, an arbitrator exercises powers delegated from the parties who have agreed to arbitrate. The arbitrator acts on their (joint) behalf, with whatever authority the contract bestows. The resulting award is effectively the parties' joint decision. "[W]e must treat the arbitrator's award as if it represented an agreement between" the parties themselves. 121 S. Ct. at 467. An employer is free to delegate, to arbitrators or anyone else, but the holder of the delegated power still speaks for the employer. This would be clear if Ameritech (unilaterally or through a collective bargaining agreement) had delegated final authority, not to an arbitrator, but to its vice president for human resources. If the VP had announced that "mere harassment" is not just cause warranting discharge, Ameritech would be responsible for that decision. The firm's board of directors or CEO could not plead helplessness as a result of the delegation and ask a jury to send the plaintiff packing; the VP would speak for the firm. Ellerth establishes that much. See also Faragher v. Boca Raton, 524 U.S. 775 (1998). If the delegation of final authority is to a person called an arbitrator rather than a person whose title is vice president, the situation is the same: the employer has by contract endowed a particular person with the authority to make a final decision on its behalf.
 
 
 15
 Suppose that, instead of being a coin-counter who harassed co-workers, Amos had been a truck driver who ran down a pedestrian while on company business. In the ensuing tort litigation, could Ameritech defend by saying that, although it knew Amos to be a poor driver, it had not fired him because it feared that an arbitrator would just reinstate him? Surely that would not be a defense. Indeed, it would not be a defense to liability even if Ameritech had fired the driver, and an arbitrator had reinstated him over the company's vigorous opposition. It would remain vicariously liable for its employee's misdeeds. Likewise under Title VII: Once the employer has been put on notice (as Ameritech was in 1975 and repeatedly since), it must act to protect other employees and bear the consequences of failure.
 
 B
 
 16
 Ameritech proposed to argue not only that the collective bargaining agreement limited its options but also that, had it fired Amos and seen the decision reversed by an arbitrator, both the firm and women in its employ would have been worse off. We tackle the financial argument here and postpone the other branch to Part II.C below.
 
 
 17
 That failed efforts to discharge an employee may lead to costly back pay awards is undeniable. Likewise, successful efforts to discharge employees for sexual harassment have ended in liability--though appellate courts have been less sympathetic than juries to the harassers. See Mackenzie v. Miller Brewing Co., 241 Wis. 2d 700, 623 N.W.2d 739 (2001) (reversing a jury's award of $24 million in favor of an executive discharged for harassing women in the workplace); Stuck in the Middle: Employers Can Face Lawsuits from Accused as Well as Accusers, 69 U.S.L.W. 2539 (Mar. 13, 2001). So we grant Ameritech's premise that keeping Amos around may have reduced its expected costs of doing business.
 
 
 18
 Nonetheless, arguments that expense justifies discriminatory conduct met their Waterloo in Los Angeles Department of Water & Power v. Manhart, 435 U.S. 702 (1978). Women challenged a requirement that they make larger monthly contributions to its pension fund than their male counterparts. The city conceded that it was treating men and women differently but argued that it had not violated Title VII because women live longer, so it costs more to provide a given level of retirement benefits to women. The Court held that the cost differential was no defense, remarking:
 
 
 19
 [The city's] argument might prevail if Title VII contained a cost-justification defense comparable to the affirmative defense available in a price discrimination suit. But neither Congress nor the courts have recognized such a defense under Title VII. . . . [W]e conclude that the . . . practice violated Title VII.
 
 
 20
 435 U.S. at 716-17. Similarly, the employer in Automobile Workers v. Johnson Controls, Inc., 499 U.S. 187 (1991), argued that it could exclude fertile women from plants where lead was in the air, because lead might injure the employees' offspring and lead to costly liability in tort. But the Supreme Court held that neither health nor cost considerations could support the employer's policy; Title VII entitles women to work without regard to the potentially higher costs that employers might experience. See also Orzel v. Wauwatosa Fire Department, 697 F.2d 743, 755 (7th Cir. 1983) (concluding that after Manhart a "cost-justification defense [is] not available in Title VII action").
 
 C
 
 21
 As for the possibility that discharge followed by reinstatement would have emboldened Amos (and other similar men) to continue their misconduct, and thus harmed women: why should we assume that discharge was Ameritech's only or even its principal option? Ameritech could have taken steps short of discharge, such as transferring Amos to a job where there would have been fewer women around. An arbitrator may have been empowered to re instate Amos, but he was not empowered to control who Amos's co-workers would be. Ameritech would have been entitled to transfer Amos to an empty room and give him make-work tasks, if that were necessary to protect its female employees. If, by giving an arbitrator the power to keep Amos on the payroll, Ameritech saddled itself with a useless employee, that would not be the first time. Featherbedding ensues from some collective bargaining agreements, and the lateral arabesque solves many a personnel problem. See Laurence J. Peter & Raymond Hull, The Peter Principle ch. 3 (1969). Because by changing Amos's assignments Ameritech could have prevented his reinstatement from injuring the women in its employ, this line of argument collapses to the cost-justification defense that we have already rejected.
 
 
 22
 We have so far indulged Ameritech's belief that an arbitrator would have been entitled to reinstate Amos. Even this is questionable, however. Although there is no free-roving "public policy exception" to arbitral awards, see Eastern Associated Coal, W.R. Grace, and Paperworkers v. Misco, Inc., 484 U.S. 29, 43-44 (1987), no arbitrator is entitled to direct a violation of positive law. An award that requires conduct "contrary to an explicit, well-defined, and dominant public policy, as ascertained by reference to positive law" must be set aside. Eastern Associated Coal, 121 S. Ct. at 467. Title VII explicitly forbids sex discrimination in the workplace. No award that required an employer to tolerate an ongoing violation of this statute could be enforced. So we have no fear that female employees could be made worse off by ruling out the defenses Ameritech proposed to make.
 
 D
 
 23
 Ameritech recognizes that it cannot contract away its obligations under Title VII. Still, it insists, the costs and difficulties created by its collective bargaining agreements are relevant to the question whether its response to Amos's misconduct was "reasonable," and thus whether his misconduct is attributed to the firm. The syllogism goes like this: employers are liable under Title VII for misconduct by subordinate employees only when the employers deal negligently (or unreasonably) with that misconduct, see Faragher, 524 U.S. at 799-808; Hostetler v. Quality Dining, Inc., 218 F.3d 798, 809-11 (7th Cir. 2000); costs are an important ingredient in the negligence calculus; employers therefore are entitled to explain to juries each of the costs and difficulties that an employer encounters. We have no quarrel with the proposition that costs matter to reasonableness. Yet this proposition does not assist Ameritech, for two reasons: first, the evidence Ameritech wants to present shows not the kind of costs all employers face, but additional costs that Ameritech has elected to bear voluntarily; second, the evidence does not explain the duration of Ameritech's conduct.
 
 
 24
 Ameritech fails to distinguish between costs that all employers face (because of the way the world works) and costs that an employer brings on itself. Suppose Ameritech had pledged to donate $100,000 to the United Way every time one of its employees committed sexual misconduct in the workplace. That promise would make it costly for Ameritech to discipline or discharge someone like Amos, for it would first have to find that misconduct occurred and pay the $100,000. Yet an employer could not argue to the jury that this cost, incurred voluntarily, made inaction in the face of women's complaints reasonable. If every firm in the industry made the same promise--if cost-increasing conduct were customary-- the higher costs still would be voluntary. Likewise with ordinary torts. A manufacturer of cigarette lighters must take cost-justified precautions to prevent injuries to children. See Todd v. Societe BIC, S.A., 9 F.3d 1216 (7th Cir. 1993) (en banc), 21 F.3d 1402 (1994) (en banc). But the manufacturer could not include the inefficiency of its own plants among the costs that it could properly take into account. Industry-wide practices and competitive pressures that raised the expense of hiring engineers to design better cigarette lighters would create costs beyond the control of any one employer, and these could be included in the negligence calculus. But the costs to which Ameritech points are not external in this way. A firm may consider those vicissitudes that the human conditions presents to any thoughtful employer. But it may not justify its actions as reasonable in the light of avoidable costs created or increased by its own decisions.
 
 
 25
 Now let us consider duration. Costs are important to the acquisition of knowledge; an employer is not required to place microphones and cameras in every corner of the workplace, so it may take a while to learn what is going on. The eeoc does not contend, however, that Ameritech failed to implement reasonable strategies to learn about the conditions its female employees were encountering. Costs also are important to an employer's initial response to accusations of misconduct. For example, an employer may defer acting while attempting to learn the truth of the matter, and it may begin with steps such as counseling if it seems likely that they will succeed. Again the eeoc does not fault Ameritech's initial responses. (Although Ameritech's decision to fire Huckeba rather than Amos is inde fensible, that occurred outside the period of limitations.) It did not take Ameritech's managers long to learn, however, that Amos is incorrigible. An employer knowing that working conditions are worse for women than for men may experiment reasonably with strategies to cure that problem, but it can not be reasonable to string that process out for a decade, as Ameritech did, no matter how high the costs of correction. Once managers knew not only of Amos's misbehavior but also of his unwillingness (or inability) to change, it had to do something more effective. Doing nothing can never be the sort of "reasonable" step that prevents imputation to the firm of the inferior working conditions encountered by a protected class of employees. Yet apart from a single (and futile) suspension in 1990, a sanction whose modesty is attributable to a manager's negligent failure to read Amos's employment file, "do nothing" was the employer's only strategy. Even if the firm acted reasonably in not discharging Amos, its do-nothing approach cannot have been reasonable, which means that Ameritech is responsible for the conditions Amos created in the workplace.
 
 III
 
 26
 Whether evidence inadmissible to establish a defense on the merits may have a role when assessing liability for (and the amount of) punitive damages is a distinct question. We proceed in three steps. First we inquire whether Ameritech has preserved its right to argue that the evidence is admissible with respect to punitive damages. Second we take up the relevance issue under Rule 402. Third we consider the possibility that any error was harmless.
 
 
 27
 * Ameritech wanted to use the evidence with respect to both liability and punitive damages; the district judge ruled that the evidence could not be used at all; Ameritech did not respond with a request that use be limited to punitive damages (which likely would have entailed a request for a bifurcated trial). Did this omission doom Ameritech's entitlement to argue in this court that, if the evidence is irrelevant to liability, it may still be relevant to punitive damages? We believe that an argument for such a distinction is open in this court, for two principal reasons.
 
 
 28
 First, the district judge made a definitive ruling excluding the evidence for all purposes. A party need not except to an evidentiary ruling; a claim is preserved for appeal if the party makes an offer of proof, as Ameritech did. Fed. R. Evid. 103(a)(2). In particular, "[o]nce the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal." Fed. R. Evid. 103(a). Although the language we have quoted did not become effective until December 1, 2000, Wilson v. Williams, 182 F.3d 562 (7th Cir. 1999) (en banc), reached the same conclusion under prior law. Litigation could not be improved by requiring a litigant, told by a judge that particular evidence is inadmissible, to step through a series of counterproposals to use the evidence for each potential subsidiary issue in a case. That would take time, cost money, and try everyone's patience, to little purpose. Ameritech therefore did not have to protest the district court's ruling or ask the judge to reconsider. It is entitled to argue on appeal that the ruling was wrong either in whole or in part.
 
 
 29
 Second, if by inaction after the district court's ruling Ameritech did forfeit its entitlement to distinguish using the evidence in the liability phase from using it in the punitive-damages phase, the eeoc by its inaction has forfeited any entitlement to the benefit of Ameritech's forfeiture. Claims of waiver may be waived in turn; claims of forfeiture may be forfeited (or waived). Burris v. Parke, 95 F.3d 465, 469-70 (7th Cir. 1996) (en banc); United States v. Newman, 144 F.3d 531, 542 n.11 (7th Cir. 1998); United States v. Leichtman, 948 F.2d 370, 375 (7th Cir. 1991). The eeoc's brief does not contend that Ameritech has forfeited its opportunity to seek reversal with respect to punitive damages. After our supplemental briefing order clearly separated the liability and punitive-damages issues, the eeoc had a second opportunity to argue that Ameritech had forfeited any opportunity to argue for different outcomes on these issues. Once again the eeoc did not argue that Ameritech has forfeited any legal position by failing to make appropriate requests or protests after the district judge's ruling in limine. We could hardly penalize Ameritech for forfeiture while overlooking the eeoc's decision not to make forfeiture an issue (a decision that deprived Ameritech of any opportunity to respond to an argument that it has forfeited part of its position). Both issues presented by our supplemental briefing order therefore are open to decision.
 
 B
 
 30
 To establish liability under Title VII, the eeoc had to prove that Ameritech as the employer (and not just Amos personally) had engaged in sex discrimination, which is a form of intentional wrongdoing. It did this by showing that, with actual knowledge of Amos's behavior, Ameritech's managers permitted Amos to continue wreaking havoc among his female co-workers. To establish an entitlement to punitive damages, the eeoc had to show more than intentional discrimination.
 
 
 31
 A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.
 
 
 32
 42 U.S.C. sec.1981a(b)(1). "Malice" toward women and "reckless indifference to the federally protected rights" of female workers are considerably more blameworthy than the carelessness (such as allowing a 30-day time limit to lapse during a manager's holiday) and general thoughtlessness that characterize much of Ameritech's conduct.
 
 
 33
 In Kolstad v. American Dental Ass'n, 527 U.S. 526, 535 (1999), the Supreme Court concluded that sec.1981a(b)(1) conditions punitive damages on "the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." The minimum requirement for a punitive award is that the employer "discriminate in the face of a perceived risk that its actions will violate federal law". Id. at 536. See also Gentry v. Export Packaging Co., 238 F.3d 842, 851-52 (7th Cir. 2001). But this minimum may not be sufficient, for at least two reasons. First, an employer aware of a risk nonetheless may believe that its conduct is lawful, making a punitive award inappropriate. See 527 U.S. at 537 (discussing situations "in which the employer discriminates with the distinct belief that its discrimination is lawful"). Second, sec.1981a(b) authorizes but does not compel an award of punitive damages. Circumstances that fail to knock out punitive damages as a matter of law still may persuade a jury that the employer's conduct was not so malicious or so reckless that damages should be added to the compensatory award.
 
 
 34
 Moreover, because the size of a punitive award reflects the jury's assessment of the defendant's blameworthiness, many circumstances that bear on this issue become relevant, even though they could not defeat liability. When in tort law a plaintiff requests punitive damages, it is common for both sides to introduce a great deal of evidence that could not be deemed relevant to liability. See, e.g., BMW of North America, Inc. v. Gore, 517 U.S. 559, 565-66 (1996); Kemezy v. Peters, 79 F.3d 33 (7th Cir. 1996); Zazu Designs v. L'Oreal, S.A., 979 F.2d 499 (7th Cir. 1992). Consider again the truck driver example from Part II.A. An arbitrator's award reinstating a poor driver, who later injured a pedestrian, would not eliminate the employer's tort liability for the pedestrian's actual loss, but it might persuade a jury not to award punitive damages or to reduce the size of any punitive award.
 
 
 35
 Judges retain, and should use, authority under Fed. R. Evid. 403 to keep the trial within sensible bounds. For example, Ameritech's desire to introduce the outcome of some other arbitration could divert the case into complex questions about whether that arbitrator's decision was justified in light of what some other employee did to some other women; a judge may curtail such a presentation and perhaps could exclude it altogether if he concluded that it would be unjust to open the question at all without allowing the eeoc to respond with particulars. But district courts may not exclude as "irrelevant" under Rules 401 and 402 any evidence bearing on the defendant's state of mind--and in particular may not categorically exclude evidence tending to show why the defendant acted as it did, for such evidence bears on "malice", "reckless indifference to the federally protected rights of an aggrieved individual", and the size of any appropriate punitive award. Accord, Palmetto State Medical Center, Inc. v. Operation Lifeline, 117 F.3d 142, 149-50 (4th Cir. 1997); Global Petrotech, Inc. v. Engelhard Corp., 58 F.3d 198, 201-02 (5th Cir. 1995). Cf. Beckwith v. Bean, 98 U.S. 266, 274-82 (1879).
 
 
 36
 Part II of this opinion concludes that the "just cause" clause of the collective bargaining agreement, and Ameritech's concern about the potential decision of an arbitrator, are not relevant to liability. But Ameritech may be able to persuade a reasonable jury that its labor-relations decisions do not evince "malice" or "reckless indifference" to the federally protected rights of female employees. The eeoc has a strong argument that Ameritech's inaction indeed demonstrates "reckless indifference", but the debate should not be preempted by disabling Ameritech from explaining itself. Moreover, as we have stressed, even "malice" and "reckless indifference" come in gradations. Keeping Amos around because of a concern with firm's bottom line is bad, but not as bad as keeping him around because Ameritech's supervisors agreed with his attitude toward, and treatment of, female workers. An employer is entitled to show that things were not as bad as they appeared, and thus to influence the jury's assignment of punitive damages. The district court's order enabled the eeoc to ask the jury rhetorically why any conscientious employer would have acted as Ameritech did unless it wanted harm to befall female workers, while disabling Ameritech from giving what may have been its best answer.
 
 C
 
 37
 The eeoc suggests that the district court's error was harmless because the jury instructions set a higher threshold for punitive damages than Kolstad later determined is appropriate. We do not believe, however, that an error in Ameritech's favor on the standard of liability precisely offsets an error in the eeoc's favor on how that standard is to be met. Whether or not the two errors canceled each other on the threshold decision to award some punitive damages, they could not have canceled each other on the quantum of damages. This is not to say that a punitive award aggregating $650,000 could not be sustained on a record containing Ameritech's full explanation for its conduct. Our point, rather, is that only assurance that any reasonable jury must return an award of some $650,000 could demonstrate the error's harmlessness. No such assurance is possible, given the great discretion juries possess when fixing the level of punitive damages.
 
 IV
 
 38
 The judgment of the district court with respect to compensatory damages is affirmed. The judgment awarding punitive damages is vacated, and the case is remanded for further proceedings consistent with Part III of this opinion.
 
 
 
 Notes:
 
 
 *
 Judge Coffey did not participate in the consideration or decision of this case. An event occurring after oral argument required Judge Ripple to recuse himself from all further deliberation and decision in this matter.
 
 
 **
 Chief Judge Flaum and Judges Manion, Kanne, Rovner, Diane P. Wood, Evans, and Williams join Part I of this opinion. Judges Rovner, Diane P. Wood, Evans, and Williams join Part II. Chief Judge Flaum and Judges Manion, Kanne, and Evans join Part III. Every portion of the opinion therefore speaks for a majority.
 
 
 
 39
 Posner, Circuit Judge, concurring.
 
 
 40
 The panel reversed the judgment in favor of the EEOC in this sexual harassment suit because the district court had excluded evidence of the employer's obligations under its collective bargaining agreement to the employee who had harassed the women on whose behalf the EEOC sued. The employer wanted to introduce this evidence both to show that it had acted reasonably in dealing with the harassment and to show that, at the least, it had not acted so unreasonably that it should have to pay punitive damages. The evidence was clearly relevant to the issue of punitive damages, less clearly to the issue of liability--so much less clearly, indeed, that I think the panel erred in ordering a new trial on liability. But we do not take cases en banc merely because of disagreement with a panel's decision, or rather a piece of a decision, least of all a piece of a decision concerning the relevance of a particular item of evidence to a particular issue in a particular case. We take cases en banc to answer questions of general importance likely to recur, or to resolve intracircuit conflicts, or to address issues of transcendent public significance-- perhaps even to curb a "runaway" panel--but not just to review a panel opinion for error, even in cases that particularly agitate judges, such as cases in which sexual harassment is charged. In attempted or at least apparent conformity to this policy, we asked the parties (when we granted rehearing en banc) to brief the following general questions: "whether, as a matter of law, evidence regarding arbitration and a company's collective bargaining agreement is inadmissible in a Title VII suit to show: 1) that an employer's response to sexual harassment was reasonable for the purpose of determining employer liability; and 2) that the employer did not act with the state of mind necessary for the imposition of punitive damages."
 
 
 41
 Although these questions have the form appropriate for en banc determination, such determination is premature. The questions have not arisen in any other reported case, and for all I know may never arise; and they need not be answered even in this case, because the error in excluding the evidence relating to the collective bargaining agreement with respect to the defendant's liability for sexual harassment, if there was an error (clearly the exclusion of that evidence with respect to punitive damages was erroneous, as the panel determined), was harmless in view of the overwhelming evidence of the employer's inadequate response to a serial harasser. The grant of rehearing en banc was gratuitous as well as premature. And it was premature not only in the sense that there was no need to answer the questions yet, but also because, as a consequence of there being no other cases, we lack an adequate basis in experience for answering general questions about relevance; we lack sufficient particulars to be able to generalize intelligently.
 
 
 42
 The majority opinion answers the first and more far-reaching of the two questions that we put to the parties-- "whether, as a matter of law, evidence regarding arbitration and a company's collective bargaining agreement is inadmissible in a Title VII suit to show . . . that an employer's response to sexual harassment was reasonable for the purpose of determining employer liability"--with a flat "yes," stating that "this evidence is not relevant to liability and therefore is inadmissible under Fed. R. Evid. 402 with respect to that subject." Yet nowhere does the opinion attempt to justify so categorical, so unqualified, an answer. All it tries to show is that the particular dispute-resolution procedures used by the employer in this case pursuant to the employer's collective bargaining agreement are not relevant to this employer's liability in the particular, indeed peculiar, circumstances that this case presents. The result of this approach is a yawning gap in logic, since it obviously does not follow that other dispute-resolution procedures used by other employers pursuant to other collective bargaining agreements in other factual settings can never be relevant to an employer's liability for sexual harassment.
 
 
 43
 It might well be thought foolhardy to lay down a blanket rule, not justified by considerations of privilege, that an entire class of evidence is "irrelevant," and therefore inadmissible, in a broad class of cases having, potentially at least, diverse facts, without some sense of what those facts might be. A narrower rule might be unexceptionable. Clearly it is no defense against a charge of failing to prevent an employee from harassing other employees that the employer had tied his hands by his contract with the harasser. If a collective bargaining agreement stated that an alleged harasser could not be terminated unless his guilt was proved beyond a reasonable doubt, and in conformity with that agreement the employer refused to take action against a harasser though his guilt was clear, albeit not clear enough to have convicted him in a criminal proceeding, the agreement would not be a defense in a suit under Title VII, or even relevant to liability, since it would add nothing to a defense based on other evidence, such as that a prompt and thorough investigation had failed to substantiate the complaint of harassment. (Evidence that an employer had schemed with the union to make it impossible to fire an alleged harasser would be relevant--as evidence for the plaintiff!) But the issue, so far as justifying the blanket rule announced at the outset of the majority opinion is concerned, is not whether a collective bargaining agreement is a defense to liability in such a suit, or whether it is always relevant to liability, but whether it is never relevant to liability; and I do not see how that question can be answered sensibly against relevance without a greater exercise of the imagination than attempted in the opinion.
 
 
 44
 Let me propose a hypothetical case, not altogether remote from the present one though readily distinguishable from it, to which the existence and terms of a collective bargaining agreement would be relevant. A worker complains to a supervisor that another worker is harassing her. The supervisor responds by immediately transferring the alleged harasser to another part of the workplace. But because of the design of the workplace the transfer does not keep the two workers apart all the time and the worker who complained insists to the supervisor that the harasser be fired. The supervisor replies that the company's collective bargaining agreement protects workers from being fired other than for cause and entitles any worker sought to be terminated for cause to notice and a hearing before a joint labor-management committee with appeal to an arbitrator, the entire procedure from complaint to final arbitration to be completed within 21 days. The complaint is filed and the arbitrator rules that the accusation of harassment is false and indeed malicious and therefore that there is no basis for terminating the harasser or even for separating him from the complainant.
 
 
 45
 Suppose the complainant then brought suit against the company under Title VII, charging that it had acted unreasonably in failing to fire her alleged harasser, as she had urged. She offers to prove that the arbitrator's decision was wrong. She succeeds in proving it. In presenting its own case, however, the employer tenders the collective bargaining agreement, with its provision on grievance and arbitration, and further offers to prove that this provision is standard in the industry. Would that evidence be irrelevant to whether the company had responded reasonably to her complaint? The company could of course just describe the steps it had taken without mentioning the collective bargaining agreement, but then the jury might wonder why the alleged harasser had any procedural rights. The majority opinion contains no reasons that would justify the exclusion of the evidence in my hypothetical case, and yet it falls under the blanket ban announced at the outset of that opinion.
 
 
 46
 I have nothing against bright-line rules, even though the inevitable consequence of such rules is to bring about substantively unjust results in certain cases. The gain in certainty will often exceed the loss that results when a rule is inflexibly applied to circumstances unforeseen when the rule was adopted and unprovided for in it. But nowhere in the majority opinion is there an effort to justify the adoption at the very outset of the development of the case law dealing with the interplay between collective bargaining and sexual harassment of a rule broader than necessary to decide this case, a rule that sweeps into the dustbin the hypothetical case that I have described as well as others as yet unimagined. A flat rule is stated at the outset of the opinion; reasons justifying a narrow rule are then presented; no effort to connect the two logically distinct parts of the opinion is made.
 
 
 47
 We are in danger of forgetting that not all complaints of sexual harassment are well founded, that not all alleged harassers are guilty as charged, and that companies do not typically enter into collective bargaining agreements in order to curtail their employees' legal rights; nor do unions seek to bargain away those rights. It apparently is easy to lose sight of these elementary points in a case such as the present one, but it is precisely the lurid facts of this case that threaten to distract us from the question whether we should lay down a blanket rule that the grievance and arbitration provisions in a collective bargaining agreement are never relevant to an employer's response to a complaint of harassment. There is no support in previous cases, let alone in Title VII or in the majority opinion, for such a rule, and it makes very little sense that I can see.
 
 
 48
 Flaum, Chief Judge, with whom Manion and Kanne, Circuit Judges, join, concurring in part and dissenting in part.
 
 
 49
 After examining and dismissing Ameritech's proposed justifications for admitting its collective bargaining agreement ("CBA") evidence on the issue of liability, the majority sets forth that, from this day forward, CBAs can never be admitted in any Title VII dispute on the issue of liability. I believe that the adoption of such a sweeping dictate represents a marked departure from our evidentiary jurisprudence, and may in the future drastically alter the manner in which Title VII cases are adjudicated. In an area of developing law, where we should proceed with due caution, in my view the majority has vaulted forward, cementing a categorical rule that is without warrant and perhaps counterproductive. Therefore, while I join Parts I and III of the majority's decision, I must respectfully dissent from Part II.
 
 I.
 
 50
 That Amos's actions were reprehensible, no rational person could dispute. Likewise, it is not debatable that Amos deserved to be discharged well before he was. However, as Judge Posner correctly points out, our obligation in an en banc setting is greater than any single dispute. While meting out justice on an individual case basis, it is critical that we remain vigilant of the manner in which any rule we articulate will be employed in the future. Thus, we must to a degree detach ourselves from the disturbing facts of this case, admittedly a task not easily accomplished, and focus on the overriding legal question. Once we put aside our disgust over totally inappropriate conduct, this case devolves to an evidentiary issue of considerable signifi cance. As we articulated in anticipation of this en banc review, that issue is "whether, as a matter of law, evidence regarding arbitration and a company's collective bargaining agreement is inadmissible in a Title VII suit to show . . . that an employer's response to sexual harassment was reasonable for the purpose of determining employer liability."
 
 
 51
 In response, the majority flatly states that such "evidence is not relevant to liability and therefore is inadmissible under Fed. R. Evid. 402." In making that determination, the majority opinion emphasizes that none of the proffered reasons for which Ameritech sought to introduce the CBA could have been "sufficient to defeat liability under Title VII"; and I do not dispute that assertion. It is uncontested that employers cannot use collective bargaining agreements to contract around anti-discrimination laws like Title VII. See Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 79 (1977). However, Ameritech is not seeking to use its obligations under the CBA as an affirmative defense precluding liability under Title VII. Rather, Ameritech seeks only to introduce evidence as to its obligations under its CBA to show that its response to Amos's conduct was reasonable. As we have stated in other areas, "[r]easonableness depends upon the circumstances presented in a given situation and upon balancing the public, governmental, and private interests at stake in that situation." Shields v. Burge, 874 F.2d 1201, 1204 (7th Cir. 1989). The adoption of a categorical rule of exclusion in an area of case-specific analysis seems incongruous. Indeed, the majority's explication that Ameritech's CBA evidence was insufficient to defeat Title VII liability would, at most, justify only a finding that the exclusion of that evidence during trial was of an inconsequential nature. However, the majority rushes onward, stating that because Ameritech's proffered reasons for introducing the CBA evidence would not have been sufficient to defeat liability under Title VII, the evidence was irrelevant as a matter of law, and thus subject to exclusion under Federal Rule of Evidence 402.[1]
 
 
 52
 Yet we, nor any other court, have ever supposed that because a piece of evidence, standing alone, could not operate to negate liability, that such evidence has no part in a trial. Rule 401 of the Federal Rules of Evidence sets a much more liberal standard. Under that Rule, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401 (emphasis added). This definition of relevant evidence is an expansive one. To be relevant, evidence need not conclusively decide the ultimate issue in a case, nor make the proposition appear more probable, "but it must in some degree advance the inquiry." 1 J. Weinstein & M. Berger, Weinstein's Federal Evidence sec. 401.04[2][b]; see also Davis v. Lane, 814 F.2d 397, 399 (7th Cir. 1987). As we have noted, this "is not a difficult standard to meet." United States v. Brisk, 171 F.3d 514, 525 (7th Cir. 1999). For that reason, relevance under Rule 402 must be construed liberally, Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 587 (1993), and the "[e]xclusion of relevant evidence should be used sparingly." Morgan v. United Air Lines, Inc., 750 F. Supp. 1046, 1055 (D. Colo. 1990); see also Gentile v. County of Suffolk, 926 F.2d 142, 151 (2d Cir. 1991). Here therefore, the question should not be whether Ameritech's obligations under the CBA made its actions reasonable, but rather whether Ameritech's obligations under the CBA assist us in that determination.
 
 
 53
 In fact, our definition of what constitutes relevant evidence has been expanded even further beyond the lax standard articulated in the Federal Rules. For example, even when a piece of evidence did not technically make a fact of consequence more or less probable, we have allowed the entry of that evidence when it fills the gap that its exclusion might create. "Evidence is relevant if its exclusion would leave a chronological and conceptual void in the story." Wilson v. Groaning, 25 F.3d 581, 584 (7th Cir. 1994) ("Leaving out this evidence would have left the jury with an unduly sanitized and incomplete version of the facts."); see also United States v. Vretta, 790 F.2d 651, 655 (7th Cir. 1986). Similarly, evidence is often considered relevant background information when it permits a jury to better understand the context of an employer's actions. See Fed. R. Evid. 401 advisory committee's note; cf. Old Chief v. United States, 519 U.S. 172, 18689 (1997); Blue Cross and Blue Shield of N.J., Inc. v. Philip Morris, Inc., 138 F.Supp. 2d 357, 365-72 (E.D.N.Y. 2001) (Weinstein, J.). In this instance, faced with voluminous evidence of Amos's lamentable conduct, the jury no doubt wondered why Ameritech did not terminate Amos sooner. Indeed, its determination on liability may well have hinged on that fact. Ameritech's CBA evidence, while by no means exculpating the company from Title VII liability, would have provided the jury with the motivation behind Ameritech's delay. Any particular disciplinary decision is much more likely to appear reasonable if an employer is able to explain the considerations that led it to that choice, including the disciplinary system that it has formulated to address employee infractions. Our sister circuits have recognized this and have considered evidence of an employer's own internal investigatory and disciplinary procedures in determining whether its response to harassment was reasonable. See Curry v. District of Columbia, 195 F.3d 654, 660 n.13 (D.C. Cir. 1999); Dhyne v. Meiners Thriftway, Inc., 184 F.3d 983, 988 (8th Cir. 1999); Waymire v. Harris County, Tex., 86 F.3d 424, 429 (5th Cir. 1996). Of course, the jury in this case could still have found Ameritech's actions to be blameworthy, and even determined that Ameritech's proffered motivation made it more probable that the company acted unreasonably rather than less. However, that decision would have been made with the benefit of all relevant evidence.
 
 II.
 
 54
 In support of its decision, the majority asserts that a CBA is a consensual agreement, akin to any private contract, and that employers cannot by their consent avoid duties under federal law. I do not quarrel with the latter proposition. As for the former, while the supposition that a CBA is tantamount to a private contract for Title VII does have some superficial appeal, it ignores the undeniably unique federal character of CBAs.
 
 
 55
 Unlike private employment contracts, the creation and interpretation of CBAs are governed by federal law. A large body of decisions from both the federal courts and the National Labor Relations Board ("NLRB") place significant restraints on the kinds of negotiating tactics that both employers and unions can utilize. While negotiating a CBA, an employer must be concerned that its actions will form the basis of a charge causing it to be disciplined by the NLRB for committing an unfair labor practice, a concern notably absent in most contract negotiations.
 
 
 56
 Federal law clearly shapes and restricts the menu of terms a unionized firm will be able to obtain in a CBA. In negotiating most contracts, a party has the very important ability to walk away from the bargaining table, or threaten to do so. If the opposite party is taking an unreasonable position, one can seek more agreeable partners and better terms elsewhere. Not so for the unionized employer. It is required by federal law to negotiate with the union elected by its workers, forbidden by those laws from bargaining with another union or directly bargaining with its actual or potential employees. See United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 580 (1960) (recognizing that, unlike regular contract negotiations where parties have "no real compulsion to deal with one another, as opposed to dealing with other parties," unionized employers are locked into a relationship with a particular union). Moreover, the incentives of a recognized union, which wishes to show its value to the workers it represents, will lead it to bargain hard for increased job security, see Duffy Tool & Stamping, L.L.C. v. NLRB, 233 F.3d 995, 998-99 (7th Cir. 2000), which will normally involve demanding (and receiving) a just cause provision, see Estelle D. Franklin, Maneuvering Through the Labyrinth: The Employers' Paradox in Responding to Hostile Environment Sexual Harassment--A Proposed Way Out, 67 Fordham L. Rev. 1517, 1561 n.203 ("Ninety-four percent of all collective bargaining agreements contain just cause or equivalent clauses."), backed by arbitration, see Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 411 n.11 (1988) ("Arbitrators are delegated by nearly all collective-bargaining agreements as the adjudicators of contract disputes.").
 
 
 57
 One of the primary purposes of the federal labor laws imposing collective bargaining was to achieve provisions such as the just cause and arbitration clauses to which Ameritech is subject. See United Steelworkers of Am. v. Enterprise Wheel & Car Corp., 363 U.S. 593, 596 (1960) (noting "federal policy of settling labor disputes by arbitration"); Warrior & Gulf, 363 U.S. at 578 ("The present federal policy is to promote industrial stabilization through the collective bargaining agreement. A major factor in achieving industrial peace is the inclusion of a provision for arbitration of grievances in the collective bargaining agreement.") (citation and footnote omitted); id. at 582 (discussing, in the context of labor relations governed by CBAs, "congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration").
 
 
 58
 Given the federally-influenced constraints that a CBA imposes on a company in disciplining employees, it would be inexact to liken a CBA to a voluntarily-adopted private employment contract. As part of its explanation for why it did not react with greater asperity or severity in response to Amos, Ameritech should have been permitted to expound on how its obligations stemming from federal labor law impacted the specific actions that were reasonable for it take in attempting to comply with Title VII. The jury would have been free to decide that even with the constraints of the CBA, Amos's harassment was severe enough that Ameritech failed to exercise reasonable care by not firing Amos sooner and thus violated Title VII. However, the jury should have been permitted to consider how Ameritech's obligations resulting from the federal law impact the content of its duty to exercise reasonable care to prevent co-worker harassment under Title VII.[2]
 
 III.
 
 59
 Relying on the Court's decisions in Los Angeles Department of Water & Power v. Manhart, 435 U.S. 702 (1978) and Automobile Workers v. Johnson Controls, Inc., 499 U.S. 187 (1991), the majority states that a cost-based justification is not available in Title VII actions. I do not dispute the accuracy of that statement in the context of the cases relied upon, and the hypotheticals articulated by the majority. Undoubtably, a corporate defendant is strictly liable for acts that can fairly be said to be acts of the company itself, such as torts committed by employees acting in the scope of employment. See Restatement (Second) of Agency sec. 219(1). Likewise, when the company's management, to whom the formulation of corporate policy is entrusted, enacts a company policy that discriminates against women, this is considered an act by the company itself. Thus, under traditional agency principles, the corporation is strictly liable for the effects of such a decision and will not be heard to complain that costs or even beneficence motivated the discriminatory policy.
 
 
 60
 But, those agency principles for imposing vicarious strict liability on the company do not apply in the cases of co-worker harassment. Sexual harassment is not within the scope of the harasser's employment. See Faragher v. City of Boca Raton, 524 U.S. 775, 798-800 (1998). Thus, a co-worker does not possess the kind of company authority to make a company strictly liable for that individual's harassment. It is for that reason that men or women victimized by co-worker sexual harassment can recover from an employer only by showing that the employer was negligent. See id. at 799 (noting that circuit courts "uni formly judg[e] employer liability for co-worker harassment under a negligence standard").
 
 
 61
 Costs have long been a consideration in the question of whether a person or company was negligent, see United States v. Carroll Towing Co., 159 F.2d 169, 173 (2d Cir. 1947) (L. Hand, J.), and to say to the contrary, as the majority does today, is to depart from what has been implicit in our decisions up until this point. In Zimmerman v. Cook County Sheriff's Department, 96 F.3d 1017, 1019 (7th Cir. 1996), we noted that an employer need not adopt an "Orwellian program of continuous surveillance," even though it is undeniable that employees would engage in less harassment if they were constantly watched. Likewise, for hostile environments that are not too severe, remedies such as warnings, probation, or transfers are reasonable, see Savino v. C.P. Hall Co., 199 F.3d 925, 936 (7th Cir. 1999); McKenzie v. Illinois Dep't of Transp., 92 F.3d 473, 480 (7th Cir. 1996); Baskerville v. Culligan Int'l Co., 50 F.3d 428, 432 (7th Cir. 1995); accord Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 676 (10th Cir. 1998); Harris v. L & L Wings, Inc., 132 F.3d 978, 984 (4th Cir. 1997); Knabe v. Boury Corp., 114 F.3d 407, 414 (3d Cir. 1997), even though less harassment would occur if the company took the costly step of summarily firing every verified harasser, or even every employee who was accused of harassment. The underlying theme in these decisions is that an employer will not be held liable for failing to take unreason ably burdensome measures to prevent co-worker harassment, even when the adoption of those measures would guarantee that harassment would not take place.
 
 
 62
 If one concludes that a company could drastically reduce (if not eradicate) harassment in the workplace if it spent an unlimited amount of resources on the problem (e.g., pervasive screening, daily training, constant monitoring), and that the costs of such measures are irrelevant for Title VII purposes, then I fail to see how a company could ever defend against liability if it did not fully implement all conceivable measures. Thus, despite paying lip service to the concept of negligence, I am concerned that the majority may have insured that companies in future Title VII suits will be judged by a standard more akin to strict liability. One can only conjecture as to whether the imposition of such a liability regime will result in increased or decreased employer expenditures on preventing (and responding to) sexual harassment in the workplace.
 
 
 63
 Despite its assertion that cost-based justifications met their Waterloo in Manhart, the majority nonetheless acknowledges that "costs matter to reasonableness." However, the majority seeks to cabin the import of that acknowledgment by stating that while costs may factor into a reasonableness determination, those "additional" costs which an employer voluntarily elects to bear are inadmissible in Title VII liability disputes. While this apparent demarcation may appear attractive, the waters become muddied the instant one attempts to discern what constitutes an additional, voluntarily-elected cost as opposed to a cost that all employers must face. For instance, in an effort to prevent sexual harassment, an employer will adopt a set of administrative procedures, tailored to that company, for detecting, and responding to, employee co-worker harassment. If an employee were to sue the company, alleging that it did not discharge a harasser with proper rapidity, it is unclear whether the company would be able to explain how the procedures it chose to adopt to deal with harassment influenced the timeliness of its response. Surely, the specific measures a company has chosen to implement constitute additional, voluntarily-elected costs. But, as the Fifth Circuit has noted, "in analyzing the promptness of response it is important to keep in mind the entity's lines of command [and] organization format." Waymire, 86 F.3d at 429 (emphasis added and citation omitted). Of course, it is possible to argue that every company must establish guidelines for dealing with harassment, and thus, an individual employer's procedures are not an additional, voluntarily-elected cost, and are therefore admissible. What becomes apparent is that, depending on the level of abstraction employed, most any cost incurred in the prevention of sexual harassment may be designated as an additional, voluntarily-elected cost, or a cost faced by all employers. While it is impossible to foresee how the majority's approach will impact future Title VII disputes, I fear the result will be random and inconsistent trial-level admissibility determinations, based largely on litigants' abilities to characterize costs.
 
 IV.
 
 64
 Judge Posner's concurrence provides what some might consider an attractive middle ground. While it criticizes the expansive rule articulated by the majority, it finds any error in the district court's decision to be harmless. Ultimately, I believe that the district court did in fact err, and I cannot state unequivocally that such error was harmless. Here, the decision of the district court left Ameritech with two alternatives: one unappealing, the other disingenuous. Ameritech was forced to assert either that Amos's conduct did not violate Title VII or that the company was not on notice of the conduct. It is certainly possible, perhaps even probable, that had the jury heard the evidence of Ameritech's obligations under the CBA, it still would have found the company guilty. However, in the end, that is a judgment call on which I respectfully disagree with Judge Posner. The district court's decision to exclude the CBA evidence effectively tied the hands of Ameritech, leaving the company with no defense to raise. Under those circumstances, I cannot conclude that the district court's decision was harmless.
 
 
 65
 I firmly believe that the majority opinion's broad stroke today will prove to be a harmful impediment to litigants in future Title VII cases. The majority has proposed numerous hypotheticals, in all of which, CBA evidence would be inadmissible. However, no matter how many vignettes are raised in which the evidence would be deemed inadmissible, that does not justify the adoption of a categorical rule. Perhaps a case will seldom arise where such evidence is relevant in a liability setting. Yet that is no justification to rush towards an absolute precept. Given Amos's egregious conduct and Ameritech's all too deliberate pace in disciplining him, few may quibble with the application of the majority's approach in this case. However, I remain concerned with the case that we will face in the future and the way this decision will be applied. Whether the rule articulated by the majority will prove to be beneficial or deleterious in future cases is difficult to foretell. I simply believe that neither our case law nor prudence justifies such a step. Therefore, I must respectfully dissent from Part II of the majority's opinion.
 
 
 
 Notes:
 
 
 [1]
 According to Rule 402, "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible." This rule establishes two types of evidence which are inadmissible: relevant evidence that is excludable pursuant to requirements of the Constitution, Congress, etc., and evidence that is irrelevant, as defined in Rule 401. The majority decision has deemed the CBA evidence here to be "irrelevant on the issue of liability." Thus, the majority must believe that this evidence is excluded because the CBA does not meet the definition of relevant evidence. That being so, I fail to see how an absolute rule of exclusion is appropriate in this area.
 
 
 [2]
 It is important to emphasize once again that Ameritech does not argue that an arbitration provision in a CBA waives an employer's obligations under Title VII to prevent sexual harassment in contravention of Alexander v. Gardner-Denver Co., 415 U.S. 36, 51 (1974). Rather, it only wishes to introduce the CBA to assist in convincing the jury that its actions constituted reasonable care. As stated above, other circuits have considered evidence of an employer's own internal investigatory and disciplinary procedures in determining whether a response to harassment was reasonable. The fact that this defendant's apparatus for imposing discipline is embodied in a CBA is no reason for denying it the opportunity to explain its action that other defendants receive.
 
 
 
 66
 ROVNER, Circuit Judge, with whom Diane P. Wood and Williams, Circuit Judges, join, concurring in part and dissenting in part.
 
 
 67
 I join parts I and II of Judge Easterbrook's opinion. I welcome the acknowledgment that the parties to a collective bargaining agreement may not, whether deliberately or inadvertently, contract their way out of Title VII's provisions. I welcome as well the court's recognition that the assessment of an employer's liability for sexual harassment must focus on whether the company took such measures as were reasonably necessary to stop the harass ment rather than upon what steps an arbitrator might or might not have endorsed.
 
 
 68
 I also agree, at least in the abstract, that evidence of an employer's concerns regarding the collective bargaining agreement or the likely results of arbitration pursuant to that agreement may be admissible to show that the employer's failure to halt the sexual harassment occurring in the workplace does not merit the imposition of punitive damages. Whereas the liability inquiry focuses on the objective reasonableness of what the employer did or did not do in the face of harassment, the punitive damages inquiry calls upon the factfinder to assess the mindset of the employer. Thus, although neither the provision of the CBA nor the prospect of unfavorable rulings in arbitration can excuse an employer's failure to take the measures reasonably necessary to stop harassment from recurring, an employer's concern for the requirements of a CBA and the prospect of an unfavorable outcome in arbitration may help to establish that the employer's actions and omissions, even if misguided, were not animated by malice or reckless disregard for the rights of its employees. A rule categorically excluding such evidence from the punitive damages inquiry would therefore be inappropriate.
 
 
 69
 However, before we vacate the award of punitive damages in this case and remand for a new trial, it is incumbent upon us to consider whether Ameritech was genuinely prejudiced by the exclusion of its evidence regarding the CBA and prospective arbitration over the discharge of Amos. Fed. R. Evid. 103(a)(1), Fed. R. Civ. P. 61; see Mason v. Southern Illinois Univ., 233 F.3d 1036, 1042-43, 1047 (7th Cir. 2000); Jones v. Lincoln Elec. Co., 188 F.3d 709, 724-25 (7th Cir. 1999), cert. denied, 529 U.S. 1067, 120 S. Ct. 1673 (2000); DeBiasio v. Illinois Central R.R., 52 F.3d 678, 685 (7th Cir. 1995), cert. denied, 516 U.S. 1157, 116 S. Ct. 1040 (1996). Unless there is a significant chance that the evidence might have affected the jury's verdict, then any error in its exclusion was harmless. Id.
 
 
 70
 For a number of reasons, I find it wholly implausible to suggest that the jury might have reached a different decision as to punitive damages had the excluded evidence been admitted. First, Ameritech proffered the evidence in order to explain why it did not fire Amos on two specific occasions. Yet, the EEOC's case for punitive damages was not founded exclusively or even primarily on the company's failure to fire Amos on these occasions; it rested instead on compelling proof of a long-term pattern of half-hearted and ineffectual responses to Amos' unrelenting harassment. Second, close inspection makes clear that the probative worth of the excluded evidence is diminutive as compared with the prejudice posed by a protracted inquiry into matters that ultimately are collateral to Ameritech's culpability. See Fed. R. Evid. 403. It strikes me as probable that on remand, the district court will exclude the evidence on that basis. Third, as Judge Easterbrook has demonstrated so persuasively, any difficulty that the CBA and arbitration posed to discharging Amos was of the company's own making. And to the extent that evidence concerning the CBA and the arbitration process might explain why the company was hesitant to fire Amos, it does not explain the company's failure to take other measures that might have addressed the harassment. Finally, a key premise underlying Ameritech's theory--that it was better for the women of Ameritech not to have discharged Amos in December 1992 or June 1993, because it left no obstacle to discharging him later (after he had harassed more of his co-workers)--effectively turns Title VII on its head.
 
 1.
 
 71
 One point that must be made at the outset is that Ameritech's CBA/arbitration evidence supplies at best an incomplete answer to why the company tolerated Amos' harassment for such a long period of time. Ameritech offered the evidence in order to explain the company's decision not to fire Amos on two particular occasions--in December of 1992, following the Wentland incident, and again in June 1993, following the Wolter incident. See Ameritech's En Banc Br. at 17-18, 21, 31-32, 34-35. But Amos, of course, harassed a number of women in addition to Wentland and Wolter, and the company had opportunities to address his harassment on other occasions and through means other than terminating him. It is not accurate, therefore, to say that the exclusion of the CBA/arbitration evidence as to these two incidents may have "disabl[ed]" Ameritech from presenting its best answer as to why the harassment persisted. See ante at 528.
 
 
 72
 In fact, as I have pointed out before, there was no need at all to further explain the company's response to the first of these incidents. E.E.O.C. v. Indiana Bell Tel. Co., 214 F.3d 813, 829-30 (7th Cir. 2000) (Rovner, J., concurring in part and dissenting in part). The jury was told that because the company did not promptly suspend Amos once Wentland reported that Amos had touched her, the CBA gave Ameritech only 30 days in which to decide whether and how to discipline Amos for having touched her stomach. No witness expressed the belief, and the EEOC's attorneys never argued, that the company could have fired Amos once that deadline expired. As far as the jury knew, the time limit was written in stone, so that once the deadline passed without action, the company's hands were tied. One can hardly say that Ameritech was prejudiced by the exclusion of additional evidence to the effect that an arbitrator likely would have enforced the deadline. What the EEOC argued was not that the company should have risked arbitration by firing Amos beyond the 30-day deadline, but that the company inexcusably missed the deadline in the first instance.
 
 
 73
 In practical terms, then, Ameritech's need for the CBA/ arbitration evidence was limited to the Patti Wolter incident. Ameritech would have established that the CBA required "just cause" to fire an employee, that it had lost a number of previous arbitrations regarding discharged employees, one of which involved a harasser, and that an arbitrator likely would not have viewed the "you look so sexy today" note that Amos had written to Wolter as sufficiently serious to warrant his discharge. I accept for the present that this evidence might have persuaded the factfinder that the company's decision to suspend, rather than discharge, Amos in response to the note was at worst negligent, rather than indicative of malice or reckless indifference to the rights of those whom Amos harassed. But in view of the scope of the EEOC's case against Ameritech, I find it difficult to believe that the proffered explanation for the decision not to discharge Amos was likely in any way to have altered the jury's decision to impose punitive damages.
 
 
 74
 The evidence bespeaking Ameritech's reckless indifference to the rights of its female workers was anything but marginal. Long before any of the three claimants in this case complained of misconduct by Amos, he had engaged in the full range of harassment--from offensive remarks to intimate, unwelcome bodily contact--and Ameritech had already tried (unsuccessfully) suspension and other measures short of discharge to keep the harassment from recurring. Yet, notwithstanding the ample notice of Amos' proclivities, the company's course of action during the period of time in which Amos harassed the claimants remained passive, wavering, and ineffectual. Consider the following:
 
 
 75
 1. By the time the Civil Rights Act of 1991 took effect, Ameritech was well aware that it had a serial harasser on its hands. The complaints in his file indicated that he had been making inappropriate remarks to his female co-workers, touching them, and exposing himself to them since 1975. By 1991, twelve women had complained about Amos' behavior. The company also knew that a variety of disciplinary measures had already proven unsuccessful in stopping Amos. In 1990, when six women filed a joint complaint regarding Amos' conduct (he had rubbed his penis against five of them), the company had suspended Amos for two weeks, stripped him of a sales award, and warned him (as it had in 1988) that he would be terminated if his misbehavior persisted. It did persist.
 
 
 76
 2. In February 1992--nine months before the incident that caused Debbie Wentland to complain to Ameritech--co-worker Jennifer Rice complained that Amos had made inappropriate remarks about her physique, rubbed her neck, and rubbed his body against hers. Despite Amos' lengthy history of engaging in such conduct, Ameritech did not fire him, as it had twice before promised it would do. Nor did it suspend him, as it had in 1990. In fact, the company did not take any punitive action at all against Amos. Amos himself suggested that he be transferred out of the small business office, where 95 percent of his co-workers were women. But his supervisor rejected even that suggestion. The company's sole action was to admonish Amos that he was not to have any physical contact with his co-workers--as if he were simply confused about the boundaries of acceptable behavior--and to warn him (yet again) that he faced suspension or termination if he failed to comply. Not surprisingly, given that he had been touching his co-workers inappropriately for more than fifteen years, Amos did not comply with the no-contact order.
 
 
 77
 3. In November 1992, Amos approached pregnant-co-worker Debbie Wentland, patted her stomach, and remarked, "Oh, so you are going to be a mom." Amos had been touching Wentland, and touching himself in front of her, for some time; but this event finally prompted her to complain. When Wentland reported Amos' behavior, Ameritech failed to suspend him immediately, an omission that restricted to 30 days the period of time that the company had to act on the complaint. EEO Coordinator Monica Sharp recommended to her superiors within that time frame that Amos be discharged, finding that Amos had violated the no-touch rule. Yet, because Labor Relations Manager Joyce Leck was on vacation, Sharp's recommendation sat unread on Leck's desk until after the 30-day period had expired. At that point, the company decided it could take no action against Amos. It simply warned him, for the fourth time, that further misconduct could result in suspension or termination. Predictably, Amos did engage in further misconduct.
 
 
 78
 4. On April 15, 1993, Lori Everts filed an EEOC charge asserting that Amos had been sexually harassing her for two years. Without conducting any investigation of its own into Everts' charge (consistent with its protocol for external complaints, the company instead simply cooperated with the EEOC's inquiry), an attorney in Ameritech's legal department summarily concluded that the charge had no merit. It seems that just a few months before Everts filed the charge, Sharp had been looking into Amos' conduct and had attempted to speak, largely without success, to Everts and another employee, Patricia Black, about Amos' behavior. Black's union representative had constantly interrupted her interview and allowed her to say very little; and Everts had refused to say anything at all, explaining that as a chief union steward it would be inappropriate for her to help the company investigate a union member. The refusal to cooperate with Sharp's inquiry had prompted the company to warn the union's president that it would seek to hold the union liable if Amos struck again. The company's frustration with the union, as well as its decision to leave the investigation of Everts' charge to the EEOC (and so to avoid any charge of interference or retaliation), are understandable. Given Amos' history, however, it is surprising, to the say the least, that the company would so quickly dismiss Everts' charge as meritless. If Ameritech had been truly interested in preventing further harassment, Everts' charge should have raised alarm bells. The company, however, did nothing. The results were, by this time, foreordained. Having been given a pass by his employer, Amos went on to harass Everts for several months after she filed her charge.
 
 
 79
 5. In June 1993, Patti Wolter complained after Amos left a note on her desk that read, "Patti, you look so sexy today." Remarks akin to this one had prompted a number of previous complaints from Amos' co-workers, and often these remarks were precursors to the unwelcome bodily contact and display of Amos' genitals with which the company was also well familiar. Still, the company did not fire Amos, believing that termination could not be justified on the basis of this incident, notwithstanding the wealth of complaints that had preceded it. Instead, the company opted to suspend him for the maximum period of time possible--30 days--although suspension had already proven ineffective. Beverly Gray, a supervisor in Amos' division, herself doubted that suspension would have any effect on Amos' behavior. And, indeed, it did not.
 
 
 80
 6. Not until March of 1994 did Ameritech finally take the decisive action with which it had been threatening Amos (to no avail) for years. For months, Amos had been touching Wendy Pollard's hair, staring at her with his belt unbuckled, telling her he was obsessed with her, and displaying photos of lingerie-clad and topless women to her. Being new to the small business unit, Pollard bore all of this in silence until one evening, as she was moving her work station to the "pod" at which Amos also worked, she discovered Amos with his pants open, masturbating. Nearly 20 years after another woman at Ameritech complained of similar behavior, the company at last suspended him with dispatch, conducted an investigation, and fired him.
 
 
 81
 Against this backdrop, Ameritech's case for the admission of the CBA/arbitration evidence is myopic, in the sense that it seeks to explain the company's decision not to fire Amos on just two occasions. What so convincingly demonstrates the company's indifference to the rights of its female workers, however, is not its failure to fire Amos on any particular occasion, but the whole of its meandering, passive, and predictably ineffective response to Amos. The proffered CBA/arbitration evidence does not explain why the company missed the 30-day deadline for discipline vis a vis Debbie Wentland's complaint. It does not explain why the company's own monitoring of Amos did not progressively increase with each confirmation it received that Amos, despite many prior warnings, was continuing to sexually harass his colleagues. It does not explain why the company did not steadily ratchet upward the disciplinary response to Amos as it received successive complaints of harassment. It does not explain why, after Ameritech threatened Amos with discharge in 1988 and 1990 if he continued to harass his co-workers, it took more than three years, and several more complaints of harassment, for the company to remove him. It does not explain why the company, knowing that Amos shifted his unwelcome attentions from one worker to the next, left him in a division staffed almost entirely by women and where his misdeeds apparently went unnoticed by anyone except his victims. The excluded evidence, in short, supplies no answer to how an employee could have harassed at least seventeen women over a period of many years except in a work environment in which sexual harassment was tolerated. Ameritech's invocation of the CBA, and its predictions of failure in arbitration, are a rather large red herring.
 
 2.
 
 82
 Even if we believe that the district court's stated rationale for excluding certain evidence was wrong, we may deem the error harmless if the evidence might have been properly excluded on other grounds. See, e.g., United States v. White, 222 F.3d 363, 372 (7th Cir. 2000). As Judge Easterbrook himself suggests, the district judge retains the authority, under Rule 403, "to keep the trial within sensible bounds." Ante at 18. Looking more closely at the nature of the evidence that Ameritech proposes to introduce, as well as its purpose in offering the evidence, I am not convinced that its probative worth is sufficiently strong to compel its admission, and thus to warrant a retrial.
 
 
 83
 a.
 
 
 84
 A substantial problem with the CBA/arbitration evidence is the many collateral questions it raises. Ameritech would like to demonstrate, for example, that it has an unenviable record in arbitration--Everts (who by the time of trial, was vice-president of the union) would testify that the company had lost every arbitration with which she had been involved--in order to explain why it was likely that a "premature" discharge would have resulted in Amos' reinstatement. That assertion, of course, invites comparison to the facts underlying the prior arbitrations and predictions as to whether an arbitrator might have been more or less likely to find that the company had "just cause" under the CBA to fire Amos, particularly in view of his extensive history of harassment. Further, as I pointed out in my first dissent, a ruling requiring the reinstatement of a harasser may be challenged in court on public policy grounds. 214 F.3d at 831-32. The EEOC will be free to explore that possibility as well in order to counter the impression that Ameritech inevitably would have been bound by an arbitrator's negative ruling regarding Amos. Ameritech also suggests, however, that if arbitration resulted in a finding that Amos had been terminated without just cause, the arbitrator, in addition to ordering Amos reinstated, might also have ordered the company to expunge Amos' disciplinary record, a step that would have made it more difficult to fire Amos if and when his harassment recurred. I find it hard to believe that an arbitrator would in this way hamstring a company's ability to deal with a recidivist harasser, or that a court would find such relief consistent with the terms of Title VII. More to the point, I find it hard to imagine how a jury could reasonably sort out all of the various possibilities. I understand, of course, that the jury need not determine whether, in fact, an arbitrator (and a court) would have sustained Amos' discharge; its task will be to assess whether Ameritech's delay in dealing decisively with Amos rose to the level of reckless indifference. But in order to determine whether Ameritech's professed concerns had some genuine basis, the jury inevitably will have to evaluate the likelihood of the scenarios about which Ameritech claims to have worried. The possibility for a lengthy, complex sideshow on collective bargaining and the arbitration process seems quite real.
 
 
 85
 b.
 
 
 86
 The true allure of the CBA/arbitration evidence, of course, lies in its potential to shift the blame for the delay in firing Amos from Ameritech to the arbitrator, who (the theory goes) was likely to have stood in the way had the company attempted to discharged him earlier. Yet, as Judge Easterbrook has so persuasively explained, the CBA is a contract of Ameritech's own making, and the arbitrator likewise is not an external force beyond the company's control--he exercises only such power as the parties convey to him, and to that extent he speaks for the employer. Ante at 8; Eastern Associated Coal Corp. v. United Mine Workers, 121 S. Ct. 462, 467 (2000). This is not to say that an employer will necessarily agree with the arbitrator's ruling in any particular case. It is to say, however, that the employer cannot shirk responsibility for the outcome and effects of arbitration. If a company previously has lost a series of arbitrations arising from its efforts to deal with wayward employees, including those who engage in sexual harassment, those losses do not entitle the company to simply throw up its hands when faced with another harasser. As a party to the collective bargaining agreement which delegates authority to the arbitrator, the employer has the ability to seek whatever contractual changes are necessary to deal with harassers appropriately. See ante at 7-8. And if the CBA and hostile arbitrators remain in the way of discharging or otherwise disciplining a harasser, the employer still is not relieved of the obligation to take whatever unilateral measures are within its power (reassignment, for example) to keep him from inflicting harm on his co-workers. See ante at 522.
 
 
 87
 Recall the hypothetical truck driver, known to be a menace, who strikes a pedestrian while on company business. Ante at 522. Judge Easterbrook is right to assert that the company could not justify its failure to fire the driver by claiming that an arbitrator would have reinstated him. As my colleague points out, even if an arbitrator had ordered the driver reinstated, the company, knowing of his incompetence, remained obliged to address the danger he posed to the public at large. Ante at 9, 11. Short of discharge, the company might have retrained and tested him, monitored him for drug and alcohol use, put another driver in the truck with him, and, if need be, posted him to a desk job unless and until satisfied that he could drive safely. Compensating for the results of arbitration in this way would surely have been costly to the company, but the cost is one attributable to the company itself--either it was not arbitrating effectively, or it had voluntarily bound itself to a dispute resolution system that unduly restricted its ability to deal with errant drivers.
 
 
 88
 For these very reasons, I doubt the probative worth of the excluded evidence regarding the CBA and the possibility of arbitration to Ameritech's defense against an award of punitive damages. Even if the company can show that an arbitrator would not have sustained a decision to fire Amos in December 1992 or in April 1993, that begs the question why the company otherwise left Amos in a position that enabled him to continue harassing his female co-workers in precisely the same ways he had been harassing them for years. It also leads one to wonder why, if indeed Ameritech did have a poor record in arbitration, the company did not seek changes to the CBA that would have removed whatever restraints arbitrators were placing on the company's ability to rid itself of recalcitrant harassers.
 
 
 89
 Restated as a pure concern about the monetary cost of discharging Amos prematurely, see ante at 12-13, Ameritech's theory of defense remains a double-edged sword. A financial judgment that the precautionary measures necessary to prevent injuries from occurring are not cost-justified can came back to haunt the company, as Ford learned in the Pinto litigation. See Grimshaw v. Ford Motor Co., 174 Cal. Rptr. 348, 384 (Cal. App. 1981). Even if the jury had known that Ameritech risked liability for a backpay award had it discharged Amos in December 1992 or April 1993, I cannot believe that its assessment of the company's culpability would have been different. No one but the company itself was responsible for missing the 30-day disciplinary deadline in December 1992, when by its own account it had a perfectly legitimate basis for terminating him. The possibility that a belated discharge on that occasion, or a timely discharge in April 1993 (when his behavior was less egregious), might have proved costly for Ameritech, hardly seems likely to have elicited the jury's sympathy, when the company had been putting up with Amos' misconduct for years--and years.
 
 3.
 
 90
 Perhaps the most appealing argument that Ameritech seeks to make with the arbitration evidence is that it was more prudent for the company to await a firm basis for discharging Amos--i.e., one that an arbitrator was likely to approve--than to risk having him reinstated. A premature discharge followed by reinstatement, the theory goes, would demoralize Amos' co-workers and make it all the more difficult for the company to discharge him in the future.
 
 
 91
 Implicit in this theory, however is the acknowledgment that Amos inevitably would strike again. Gone is any pretense that the disciplinary measures attempted until that point might have succeeded in stopping the harassment. The argument, in fact, rests on the premise that the harassment would recur, that consequently there would be future opportunities to discharge Amos, and that it was better to await an instance of harassment that an arbitrator likely would agree was severe enough to constitute just cause for a discharge. What the argument also assumes then, is that women harassed in the interim, in ways that the company did not think an arbitrator would find sufficiently egregious to warrant Amos' discharge, would simply have to sacrifice their right to work unmolested for the greater good of the other women who worked at Ameritech. It is as if the company said to the three claim ants in this case, "Look, we know Amos might be harassing you. But we've got these rules that make it hard for us to get rid of him. And we don't want to fire him, only to have some arbitrator tell us to take him back. Better to get rid of him once and for all. So, get back to us when he does something really bad." For the women who, like Debbie Wentland, Lori Everts, and Wendy Pollard, suffered the harassment that foreseeably occurred while Ameritech awaited a rock-solid case for discharging Amos, the theory reflects a reckless indifference to the right to do one's job without having to encounter a co-worker's penis.
 
 4.
 
 92
 In sum, the evidence supporting an award of punitive damages in this case was strong, and the likely impact of the evidence regarding the CBA and Ameritech's prospects in arbitration is modest, at best. The harassment in this case spanned a period of nearly twenty years. By December of 1992, when the first of the three claimants in this case complained, the company itself was convinced that Amos lacked either the willingness or the ability to stop harassing his co-workers. In the words of the company's EEO coordinator, Monica Sharp, Amos just "didn't seem able to control himself at Indiana Bell." But, having already missed a number of opportunities to deal with Amos decisively, the company inexcusably allowed yet another opportunity to pass by missing the deadline for discharging Amos. As a result of that mistake, and the company's consistently passive approach to dealing with Amos, three more women would fall victim to his harassment, bringing the reported total to seventeen. Not until he did something so over the top as to expose himself and masturbate at his workstation was the company finally willing to remove him from the workplace.
 
 
 93
 Ameritech's proffered CBA/arbitration evidence offers little, if any, explanation for the company's reactive and complacent responses to Amos' persistent harassment. It purports to explain only two of the missed opportunities to deal with Amos, and in actuality is only necessary as to one of the incidents. Even then, the evidence is offered to explain only why the company did not fire Amos; it supplies no explanation as to why the company did not take a variety of other measures to protect its female workers from a familiar and unrepentant harasser. In short, the evidence raises as many questions as it answers. I find it implausible that the company was genuinely prejudiced by the exclusion of this evidence. The district court should not be put to the burden of conducting another nine-day trial, nor should the victims of Amos' harassment be made to re-live a shockingly hostile work environment yet again.